IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Pennsylvania Manufacturers' Indemnity Company d/b/a PMA Insurance Group<br>Plaintiff, | )<br>)<br>)<br>) |
| v | ) Civil Action No.<br>) Jury Demanded |
| MDM Covenant Insurance, LLC<br>Defendants. | )<br>)<br>)<br>) |

## COMPLAINT FOR INDEMNITY

The Plaintiff, Pennsylvania Manufacturers' Indemnity Company d/b/a PMA Insurance Group, brings this civil action against the Defendant MDM Covenant Insurance, LLC and for their cause of action would respectfully show unto the Court as follows:

### I. PARTIES AND JURISDICTION

1. Plaintiff is a Pennsylvania Corporation with a principal place of business at 380 Sentry Parkway, Blue Bell, Pennsylvania, 19422-754. Plaintiff is registered and does business in the State of Tennessee. Plaintiff is hereafter referred to as "PMA".

2. MDM Covenant Insurance Company, LLC is a Tennessee Limited Liability Company with a principal place of business at 52517 Maryland Way, Suite 222, Brentwood, Tennessee, 37027. MDM Covenant Insurance Company, LLC is hereafter referred to as "MDM".

3. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C.

§1332. Venue is proper in this District pursuant to 28 U.S.C.§1391(b)(1) and (2).

## II. FACTS

4. For several years prior to the incidences or occurrences described further in this Complaint below, MDM acted as an insurance broker, agent, and adviser for non-party Belmont University.

5. In January or February of 2010, MDM acted as the agent, broker, and insurance adviser for Belmont University during a policy renewal at which time Belmont purchased insurance coverage from PMA including general liability coverage, inland marine coverage, commercial output coverage, and other coverages.

6. During the policy renewal period beginning at the beginning of 2010, MDM's employee, principal, agent and representative, Chris Meadows (hereafter "Meadows"), saw the renewal period as an opportunity to expand PMA's relationship with non-party Belmont University and an opportunity to save his client, Belmont University, insurance premium dollars. As a result, Meadows began the process of "shopping" Belmont's coverage to PMA and other insurance carriers. This resulted in an extensive application and underwriting process with PMA which stretched from January 2010 up until February 28, 2010, at which time the policy at issue in this cause was actually bound.

7. The insurance coverage purchased by Belmont University did not include, as Belmont University representatives have described, "separate, stand alone" flood coverage. During the application and underwriting process, Meadows never discussed the possibility of purchasing "separate, stand alone" flood coverage with decision makers at Belmont University. Meadows did not discuss this "flood coverage" during the

2

application and underwriting process which took place between January 2010 and February 28, 2010, which resulted in Belmont University's purchase of the PMA policy at issue.

8. Although MDM, through its principal, Meadows, denied that it had any discussions with Belmont University regarding the possible purchase of "flood coverage" Meadows and his assistant, Bobby Bache (hereafter "Bache"), communicated in detail with underwriters at PMA and specifically stated in response to a question from PMA's underwriters about the possibility of the purchase of flood coverage for Belmont University - "no flood."

9. As a result, the insurance policy at issue in this cause did not contain "flood coverage", and most importantly excluded loss to certain property from the peril of water (flood).

10. On May 1st and 2nd, 2010, the Nashville area incurred a heavy rain fall which resulted in an extensive flooding period. This also included surface water runoff and intrusions into different buildings and, unfortunately, caused damages from surface water and ground water intrusion into several buildings with non-party Belmont University.

11. Immediately after the May 2010 floods, Meadows began an extensive campaign to "find coverage" for Belmont University and even wanted the PMA to "make an exception" for Belmont University. Meadows then began a process of trying to "find coverage" under extensions of coverage in an effort to afford a basis to simply pay money to Belmont University regardless of whether it's losses fit within those coverage extensions.

12. Despite Meadows campaign for coverage for Belmont University, PMA

3

denied coverage. Ultimately, thereafter, Belmont University filed an action in the Chancery Court for Davidson County, Tennessee which was removed to this Court. A copy of this Complaint is attached hereto as Exhibit A.

13. On June 25, 2012, PMA settled the lawsuit while still not admitting to any flood coverage, filed by Belmont University for $125,000.

14. Despite underwriters on behalf of PMA specifically questioning Meadows about the possibility of Belmont University purchasing separate stand alone flood coverage, Meadows did not question or discuss with decision makers at Belmont University about the possibility of purchasing such coverage.

15. Decision makers on behalf of Belmont University have specifically stated that their intent to bind coverage through MDM at the time relevant was to "bind coverage that would protect the university from damage from rain water and the sorts of damage that we suffered in May of 2010." Meadows did not discuss such coverage with Belmont University decision makers.

16. Decision makers at Belmont University stated that their expectations of coverage regarding "damage from water, rainwater, and things like that. . . ." were based on "conversations with Chris and MDM representatives" despite the fact that Meadows, through his assistant, Bache, specifically told PMA "no flood" in reference to PMA's specific question about the possibility of binding flood coverage.

17. Decision makers on behalf of Belmont University specifically provided expectations as to their coverage to Meadows on behalf of MDM. Decision makers on behalf of Belmont University further maintained that in order to determine whether they were getting the coverages, according to their expectations, were based solely upon

4

verbal information given to them from Meadows on behalf of MDM.

18. Decision makers on behalf of Belmont University specifically stated that their intention was to have coverage for "rain water damage, water damage due to the casualty of weather related issues". Despite this assumption, decision makers on behalf of Belmont University were never advised by Meadows or anyone else from MDM Covenant about the possibility of purchasing separate stand alone flood coverage. Moreover, Meadows never advised Belmont University that specific flood coverage was available for their purchase.

19. Despite the fact that decision makers on behalf of Belmont University recall no conversations with Meadows in reference to the possibility of the purchase of "flood coverage" Meadows, through his assistant, Bobby Bache, advised Plaintiff in reference to specific questions about the possibility of such purchase - "no flood."

## B. CAUSES OF ACTION

### 1. Professional negligence

20. MDM, by and through its agents or representatives such as Meadows, were guilty of the following acts of professional negligence in reference to the application and renewal process for non-party Belmont University. Meadows and/or other representatives/employees of MDM failed to use the care and skill ordinarily used in the same or similar circumstances by other reputable insurance agent/broker professionals in the same or similar community at material times in reference to the application and renewal process for Belmont University at issue in this cause. Moreover, Meadows and/or other representatives/employees of MDM failed to use reasonable diligence and

5

best judgment in an effort to accomplish the purpose of their employment by Belmont University. They were guilty of the following specific acts of professional negligence:

    a.    Failing to purchase coverage requested or intended by Belmont decision-makers;

    b.    Failing to explain the scope of coverages purchased to Belmont decision-makers to determine if their expectations of coverage were consistent with the coverage purchased;

    c.    Failing to specifically inquire of Belmont decision-makers of whether they wanted to purchase flood coverage in light of PMA underwriters' question to MDM regarding the same during the underwriting and application process;

    d.    Failing to explain or advise Belmont of the scope of coverage purchased;

    e.    Failing to discuss, question or inquire of Belmont decision-makers of whether Belmont wanted flood coverage; and

    f.    Failing to advise Belmont of the availability of flood coverage for purchase.

**2. Breach of contract**

21.    At all times material, PMA and MDM were parties to an "Agent/Broker Agreement." A copy of this agreement is attached as Exhibit B.

22.    The contractual obligations PMA and MDM are enumerated in this agreement.

23.    Among other obligations, MDM had a contractual duty to abide by PMA's underwriting standards, rules, regulations, forms, guidelines and practices. Moreover, MDM had contractual right to bind coverage for PMA but only after receiving a quotation from PMA. MDM was contractually prohibited from binding risks that were not quoted by

6

PMA unless it had PMA's express authorization to do so.

24. Following the loss in question, MDM, through its representative, Chris Meadows began an extensive campaign to "find coverage" for Belmont University and even wanted the PMA to "make an exception" for Belmont University. Meadows then began a process of trying to "find coverage" under auxiliary coverages in an effort to afford a basis to simply pay money to Belmont University regardless of whether it's losses fit within those coverage extensions. MDM, through its representative Meadows, went so far as to express opinions that the losses were, in fact, covered under the policy in question, while at the same time acknowledging to PMA that "an exception" for Belmont needed to be made and knowing that MDM had specifically stated to PMA underwriters that "no flood" was to be quoted by PMA during the underwriting process or bound thereafter.

25. In an effort to leverage payments from PMA, MDM through Meadows provided coverage opinions to Belmont that losses were covered, all the while knowing that MDM had specifically stated to PMA during the underwriting process that there was to be "no flood" quoted or bound.

26. These actions by MDM resulted in a breach of its contractual obligations to PMA.

27. These actions by MDM amounted to a breach by MDM of Tenn. Code Ann. §56-8-105(1) which prohibits the unfair claims practice of "knowingly misrepresenting relevant facts or policy provisions relating coverages at issue."

28. These actions by MDM also clearly exceeded the scope of authority of MDM and was a direct attempt by MDM to influence the claims process over which MDM

7

had no contractual authority thereby breaching its contractual obligations to PMA.

### C. DAMAGES

29. As a result of the acts of professional negligence, breach of contract and unfair claim practice on the part of MDM through its agents or representatives, Meadows and others, PMA was forced to settle the claims for property damage resulting from surface water to Belmont. This settlement with non-party Belmont University was for the sum of $125,000 and was entered into on June 25, 2012. PMA seeks indemnity from MDM for the amount paid in compromise with Belmont University under provision 11.4 or any other provision of the "Agent/Broker Agreement" attached as Exhibit B.

30. PMA further seeks attorney's fees, cost of defense and any and all other damages or losses recoverable under provision 11.4 or any other provision of the "Agent/Broker Agreement" attached as Exhibit B.

### D. PRAYER FOR RELIEF

**WHEREFORE PREMISES CONSIDERED** Plaintiff, Pennsylvania Manufacturers' Indemnity Company d/b/a PMA Insurance Group respectfully requests a judgment against Defendant in the amount of $125,000 for indemnity plus cost of defense, attorneys fees, and any other damages recoverable under the laws of the State of Tennessee or under the agreement attached hereto as Exhibit B not to exceed $300,000.00.

Respectfully submitted,

WALDROP & HALL, P.A.

By _/s/ John S. Little_
John S. Little (#014941)
Attorneys for Plaintiffs
Pennsylvania Manufacturers' Indemnity
Company d/b/a PMA Insurance Group
106 South Liberty Street
P.O. Box 726
Jackson, TN 38302-0726
(731) 424-6211

## COST BOND

We acknowledge ourselves as surety for the costs of the above cause.

WALDROP & HALL, P.A.

By _/s/ John_
John S. Little
Attorneys for Plaintiffs